IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Richard McDonald,                    )
                                     )
            Plaintiff,               )
                                     )
     v.                              )    Civil Action No. 08-0658
                                     )
Pennsylvania Office of               )
Attorney General                     )
                                     )
            Defendants.              )

MEMORANDUM and ORDER

Gary L. Lancaster,
Chief Judge.                                    May  _10_ , 2010

        This is an action in employment discrimination.

Plaintiff, Richard McDonald, alleges that defendant, Pennsylvania

Office of Attorney General ("the OAG"), discriminated and

retaliated against him in violation of the Rehabilitation Act, 29

U.S.C. § 791, et seq.[1]  In particular, Mr. McDonald alleges that

the OAG failed to grant his requests for a reasonable accommodation

of his disability and ultimately terminated him on the basis of his

disability.  He also claims that defendant fired him in retaliation

for his reasonable accommodation requests.[2]  Mr. McDonald seeks

compensatory and punitive damages, as well as attorneys' fees and

---

[1]

Both the Americans with Disabilities Act and the Rehabilitation
Act apply the same standards to disability claims, and therefore
a claim under the Rehabilitation Act is analyzed under the same
framework as a claim under the American with Disabilities Act. 29
U.S.C. § 794(d); Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir.
1997); Helen L. v. DiDario, 46 F.3d 325, 330-32 (3d Cir. 1995).

[2]

McDonald has withdrawn his claims of race discrimination and race
retaliation brought pursuant to Title VII, 42 U.S.C. § 2000(e),
et seq.

costs.

The OAG has filed a motion for summary judgment, arguing that Mr. McDonald's failure to accommodate claims are time barred. The OAG also contends that: 1) Mr. McDonald is not a qualified individual with a disability because he is unable to perform the essential functions of his job, with or without a reasonable accommodation[3]; 2) the OAG made good faith efforts to engage in the interactive process; 3) the OAG had legitimate, non-discriminatory reasons for terminating plaintiff's employment; and 4) there is no causal connection between Mr. McDonald's alleged protected activity and the decision to terminate him.

For the reasons that follow, defendant's motion will be granted in part and denied in part.

I.   FACTUAL BACKGROUND

I.   FACTUAL BACKGROUND

Unless otherwise indicated, the following material facts are undisputed.  We construe all other facts in the light most favorable to plaintiff, the non-moving party.

Mr. McDonald worked for the OAG from January 2, 2002 until May 31, 2006 as a Special Agent II in the Insurance Fraud Section of the Criminal Law Division's Pittsburgh office.  The job

---

[3]

Mr. McDonald also claims that the OAG terminated him "because of his disability, record of disability and/or perceived disability." [Doc. No. 37].

description for special agents states as follows:

> Conducts criminal investigations of violations of the laws and statutes of the Commonwealth as specified in . . . (The Commonwealth Attorney Act), the Public Welfare Code . . ., the Medicare-Medicaid Antifraud and Abuse Amendments, and other applicable Commonwealth laws, statutes, and regulations.

[Doc. No. 28, Ex. 5]. In particular, a special agent is expected to be able to perform the following duties:

> Conducts surveillance, both visual and audio via electronic listening devices, for extended periods of time in all types of weather conditions;
>
> Fires and reloads a Bureau approved firearm at levels of proficiency prescribed by the Bureau utilizing a variety of bodily positions and under stressful conditions where the use of deadly force is warranted;
>
> Makes arrests, using force and weapons, inclusive of hands and feet, if necessary;
>
> Pursues subjects on feet through all types of topography and in all weather conditions;
>
> Executes searches of people, places and vehicles which may entail prolonged walking and standing, reaching, bending, or climbing, as well as the wearing of self-contained breathing apparatus and full-faced respirators;
>
> Assumes an undercover identity to infiltrate the criminal element;
>
> Operates a motor vehicle in all weather conditions and at any time of day or night;
>
> Develops and maintains contacts with informants, often in hostile environments;

Participates in the conduct of raids which may
require the use of force or weapons to subdue
subjects, the carrying and utilization of
"battering rams" and the wearing of protective
clothing and devices;

Communicates effectively, both orally and in
writing, with other agents, staff personnel,
other law enforcement personnel and the
public;

Prepares and writes investigative reports and
summaries;

Appears in court or other legal proceedings to
offer testimony and evidence;

Conducts interviews of witnesses and
interrogates subjects;

Examines financial records and other legal
documents to determine improprieties;

Utilizes photographic equipment.

According to Mr. McDonald, a typical day as an insurance
fraud agent consisted of "going through mounds of paperwork or case
loads, or it could consist of being in a vehicle driving for long
hours over multiple distances to conduct interviews." [Doc. No. 28,
Ex. 2, Mr. McDonald dep. p. 24]. Mr. McDonald typically spent one
to two days a week working in the office, with the remainder spent
conducting interviews in the field. The OAG assigned Mr. McDonald
to cover forty-two counties east of Allegheny County, Pennsylvania,
and drove four or more hours in one direction at a time. [Doc. No.
35, Ex. 1, p. 198]. Mr. McDonald also participated in arrests, the
majority of which were scheduled with the local District
Magistrate's office, where defendants would meet

Participates in the conduct of raids which may require the use of force or weapons to subdue subjects, the carrying and utilization of "battering rams" and the wearing of protective clothing and devices;

Communicates effectively, both orally and in writing, with other agents, staff personnel, other law enforcement personnel and the public;

Prepares and writes investigative reports and summaries;

Appears in court or other legal proceedings to offer testimony and evidence;

Conducts interviews of witnesses and interrogates subjects;

Examines financial records and other legal documents to determine improprieties;

Utilizes photographic equipment.

According to Mr. McDonald, a typical day as an insurance fraud agent consisted of "going through mounds of paperwork or case loads, or it could consist of being in a vehicle driving for long hours over multiple distances to conduct interviews." [Doc. No. 28, Ex. 2, Mr. McDonald dep. p. 24]. Mr. McDonald typically spent one to two days a week working in the office, with the remainder spent conducting interviews in the field. The OAG assigned Mr. McDonald to cover forty-two counties east of Allegheny County, Pennsylvania, and drove four or more hours in one direction at a time. [Doc. No. 35, Ex. 1, p. 198]. Mr. McDonald also participated in arrests, the majority of which were scheduled with the local District Magistrate's office, where defendants would meet with Mr. McDonald

by appointment.

On December 11, 2002, Mr. McDonald was involved in a work-related motor vehicle accident while driving to Warren, Pennsylvania to conduct a field interview. [Doc. No. 25, Ex. 6, p. 30]. Following the accident, Mr. McDonald began to suffer from lower back and neck pain.

In January 2003, Mr. McDonald had an MRI of his spine, which showed evidence of a degenerative disk. He continued to work while pursuing non-operative care, including physical therapy. In early 2003, Mr. McDonald submitted a doctor's note requesting frequent breaks while driving, which the OAG granted. [Id. at p. 35-36]. Mr. McDonald also asked his then supervisor, Harold Johnson, to only assign him to local cases so as to not have to drive as far, but that request was rejected. [Doc. No. 35, Ex. 1, pp. 204-05]. Mr. McDonald and another agent traveled to North Carolina for a work assignment. Mr. McDonald asked to be excused from this trip because of back pain, but the OAG denied his request. [Doc. No. 25, Ex. 7, p. 39].

Around May 16, 2003, Mr. McDonald left work for approximately one month because of his back pain. During that time, he was placed on short term disability status and provided with benefits under the Pennsylvania Heart and Lung Act.[4] He was

---

[4]

The Enforcement Officer Disability Benefits Law (Heart & Lung Act), Act 193 of 1935, P.L. 477, provides temporary disability benefits equal to one-hundred percent of salary, tax free, to injured law

released by his doctor to return to work on June 23, 2003, with limitations such as stopping frequently and switching from standing to sitting positions. The OAG granted these requests.

In November 2003, after Mr. McDonald's physical therapy treatment failed to significantly alleviate his pain, Dr. Eugene Bonaroti performed a lumbar decompression and fusion surgery. [Doc. No. 25, Ex. 13, p. 5]. Following surgery, Mr. McDonald was absent from work from November 2003 until August 8, 2005, and again collecting disability benefits.

According to the collective bargaining agreement between the American Federation of State, County and Municipal Employees (AFSCME), of which Mr. McDonald was a member, and the OAG:

> An employee has the right to return to a position in the same or equivalent classification held before being disabled, for a period of up to three years from the date the injury occurred provided the employee is fully capable of performing the duties of that position . . .
>
> During the three-year period, employees who are not fully capable of performing the duties of their position shall have, upon request, a right to return to an available position in a lower classification, within the same geographical/organizational limitation as the seniority unit, to which there are no seniority claims and which the agency intends to fill, provided the employee meets the minimum requirements and qualifications essential to the work of the classification and the employee is fully capable of

---

enforcement officers. Recipients also receive health insurance benefits and continued accrual of seniority and paid leave time.

> performing the duties of the position . . .
>
> The Commonwealth agrees to the use of modified duty where the employee is able to work only in a limited capacity and the prognosis for the injury indicates that the employee will be able to resume all of the duties of the employee's classification in a reasonable period of time.

[Doc. No. 25, Ex. 12, pp. 77-79].

On August 30, 2004, at the behest of the OAG, Mr. McDonald, while still on leave, underwent an independent medical examination performed by Dr. Daniel Wecht at the University of Pittsburgh Medical Center. Dr. Wecht reported that despite "what appears to have been a technically successful operation, Mr. McDonald continues to experience severe mechanical back pain" which "strongly suggests some type of ongoing structural spinal issue."

Dr. Wecht opined that surgery had failed to correct the problem, and that Mr. McDonald's prognosis was "guarded, at best, since there is no clear understanding of the reason for Mr. McDonald's ongoing difficulties, and therefore, there is no clear appreciation of what might be done to help him." Dr. Wecht was unsure whether Mr. McDonald had achieved maximum medical improvement at that time, but did not believe that Mr. McDonald had "recovered to anywhere near his pre-injury baseline." [Doc. No. 25, Ex. 13, pp. 7-11]. Dr. Wecht's "Return to Work Evaluation" recommended that Mr. McDonald could perform only sedentary and light work, and drive for one hour in an eight hour period. [Id. at

7

11].

Mr. McDonald himself stated that he could not return to work at this time:

> Q. Did you think that you could return to work at that time? Again, this is late August 2004.
>
> A. No.
>
> Q. You didn't make any attempt to return to work at that time, did you?
>
> A. No.

[Doc. No. 28, Ex. 3, p. 50].

In May 2005, the OAG asked Mr. McDonald to undergo a second independent medical evaluation. This exam was conducted by Dr. Michael Weiss. Mr. McDonald told Dr. Weiss that he continued to suffer from ongoing low back pain and limited range of motion. In his report, Dr. Weiss opined that "(Mr. McDonald) has reached maximum medical improvement and more than likely will not have further improvement in his overall condition out into the future." [Doc. No. 25, Ex. 14, p. 14-15].

Dr. Weiss further stated that he believed Mr. McDonald capable of working at a "light to light-medium" type of position on a full-time basis. [Id. at 15]. However, Dr. Weiss believed that because of the heavier nature of Mr. McDonald's job, "he will [not] be able to return to that job either now or out into the future." [Id.] Dr. Weiss also noted that Mr. McDonald was using "a significant amount of chronic narcotic pain medication on a regular

8

basis." [Id.]   At that time, Mr. McDonald's medications included Avinza, Zoloft, Lyrica, and Vicodin.

In August 2005, Mr. McDonald's treating physician released him to return to work as a special agent in the Insurance Fraud Section. [Doc. No. 25, Ex. 7, p. 57].   Upon returning to work, Mr. McDonald traveled to Harrisburg with another agent to receive a replacement vehicle.   Mr. McDonald selected a Chrysler Sebring, and drove it back to Pittsburgh.   Shortly thereafter, Mr. McDonald contacted Richard Poff, an automotive officer who assigned vehicles to agents, to request a new vehicle. [Id. at 59]. Poff informed Mr. McDonald that there were no other vehicles available to assign to him.   Mr. McDonald then requested a new vehicle from William  Raquet,  deputy  chief  of  the  Bureau  of  Criminal Investigations.    [Id. at 61].    Mr. Raquet inquired on Mr. McDonald's behalf, but was informed that there were no alternative vehicles available. Mr. Raquet offered to switch vehicles, but Mr. McDonald declined.

On September 22, 2005, Mr. McDonald submitted a note from Dr. Bonaroti stating that Mr. McDonald needed to "change position frequently especially when driving."   The OAG granted this request. [Doc. No. 25, Ex. 7, p. 59].   Around this time, the OAG denied Mr. McDonald's  applications  for  two  promotions  available  for supervisory positions in the Insurance Fraud Section. [Doc. No. 35, Ex. 17, pp. 64-70].

On January 9, 2006, Mr. McDonald sent an email to Raquet stating: "Just a friendly reminder concerning a past request, if a vehicle becomes available may I switch it for my current vehicle? If this is a problem I understand and you can disregard this request. As always thank you for your time and attention." [Doc. No. 25, Ex. 18]. Mr. Raquet never responded to this request.

On January 19, 2006, Mr. McDonald was taken off work by Dr. Bonaroti, who wrote that Mr. McDonald was "to be off of work until further notice." [Doc. No. 25, Ex. 19]. On April 11, 2006, Mr. McDonald underwent another independent medical examination by Dr. Wecht. Dr. Wecht reported that Mr. McDonald had to discontinue work because "the same pain he had been experiencing had gotten worse with prolonged physical activities," particularly the "significant amount of driving that was required of him for the usual work-related duties." [Doc. No. 35, Ex. 10, p. 5; Doc. No. 35, Ex. 1, pp. 70-71]. Dr. Wecht further opined that Mr. McDonald had reached maximum medical improvement. Dr. Wecht also reported that Mr. McDonald's functional capacities were "likely of a permanent nature."

On May 31, 2006, more than three years after his injury, the OAG sent Mr. McDonald a letter terminating his employment:

> Although we recognize that you have undergone therapy and surgery in an attempt to return to your pre-injury physical condition, we are forced to discontinue your employment since your injury on December 11, 2002, has been deemed permanent and prevents you from

10

> performing   your   full   duties   and
> responsibilities as a criminal law enforcement
> agent of the Office of Attorney General.

[Doc. No. 25, Ex. 31, p. 2]. Bruce Sarteschi, director of Human

Resources at the OAG, testified that the decision was made "because

the information we had [indicated] that[] he was permanently

disabled to perform the duties of a special agent."   In response,

Mr. McDonald and the AFSCME filed a grievance pursuant to the

union's collective bargaining agreement.

Mr. McDonald admitted in his deposition that he was

unable to work at the time he received his termination letter:

> Q. Prior to your receiving this letter, did
> you make any attempt to return to work at the
> OAG?
>
> A. No.
>
> Q. And you didn't provide them with any
> documentation that you were able to return to
> work at that time, did you?
>
> A. No.
>
> Q. Were you able to return to work at that
> time?
>
> A. No.

[Doc. No. 28, Ex. 4, p. 73].

In July 2006, Mr. McDonald underwent a second back

surgery.   Following this surgery, he felt that he was capable of

returning to full-duty work. [Doc. No. 44, Ex. 4, p. 98].   Mr.

McDonald informed the OAG that he desired to return to work, and on

September 13, 2006, Mr. McDonald submitted a note from Dr.

11

Bookwalter stating that he could return to work full time with the accommodation of a "hi (sic) back rigid seating & frequent stops from driving." [Doc. No. 35, Ex. 12].

The OAG agreed to one more independent medical examination, this one conducted by orthopedic surgeon Dr. Ronald Hall. Dr. Hall examined Mr. McDonald on December 18, 2006. In his report, Dr. Hall opined that although Mr. McDonald's prognosis was good, Mr. McDonald had achieved maximum medical improvement and could not fulfill all the duties of his job. [Doc. No. 25, Ex. 35, pp. 3-4].[5]

On January 18, 2007, the OAG sent Mr. McDonald a letter informing him of the results of Dr. Hall's examination. The letter also stated: "If you intend to provide any additional information for our consideration, such as a request for a reasonable accommodation, please do so as soon as possible." [Doc. No. 25, Ex. 36]. Mr. McDonald did not request a further accommodation.

On February 7, 2007, the OAG sent a letter to Eric Momberger, AFSCME staff representative, stating that there were no available positions for Mr. McDonald, and offered to place Mr.

---

[5]

In Dr. Hall's opinion, Mr. McDonald could not specifically preform the following job duties of a special agent: qualify for an approved firearm; fire and reload a firearm in the line of duty; make arrests, using force and weapons, inclusive of hands and feet; pursue subjects on foot; execute searches of people, places and vehicles involving prolonged walking, standing, reaching, bending or climbing; operate a motor vehicle in all weather conditions; develop and maintain contact with informants; working prolonged hours; and participating in raids.

McDonald back on the payroll in leave without pay status so he could apply for disability retirement. [Doc. No. 25, Ex. 37].   Mr. McDonald did not reply to that letter.   At no time did the OAG offer to return him to work. [Doc. No. 25, Ex. 32, pp. 74-76].

## II.   PROCEDURAL HISTORY

On March 12, 2007, Mr. McDonald filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and termination on the basis of a disability. [Doc. No.  44-2].   In his EEOC complaint, Mr. McDonald stated, in pertinent part:

> The reason for my involuntary termination is that Respondent perceives me as disabled and not being able to perform the essential functions of my job.  I am able to perform the essential functions of my job, with or without a reasonable accommodation . . . I believe I have been discriminated against on the basis of my disability, record of disability and/or perceived disability, in that I have been terminated while other non-disabled employees have been retained.

[Doc. No. 44, Ex. 2]. Mr. McDonald alleged that the date of the last discriminatory act was May 31, 2006 (the date of the OAG's termination letter), and left unchecked the box that states "Continuing Action."   The EEOC issued a notice of right to sue on February 15, 2008.   Mr. McDonald filed suit in this court on May 15, 2008. On December 17, 2009, the OAG filed a motion for summary judgment.

13

On January 28, 2010, after summary judgment motions and briefs had been submitted, Mr. McDonald filed an amended complaint, alleging: 1) that the OAG discriminated against him on the basis of a disability by terminating him and denying his requests for reasonable accommodations; and 2) that the OAG retaliated against him by firing him for requesting a reasonable accommodation. In his amended complaint, Mr. McDonald alleged that he

> returned to work on August 8, 2005 until January 22, 2006, during which time Defendant denied his continued requests for reasonable accommodations. Due to his work-related injury, Mr. McDonald was off work again because Defendant refused to provide him a reasonable accommodation, including changing his work vehicle to one with a harder driver seat.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The mere existence of some factual dispute between the

14

parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e. the material facts, however, will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248-49. Under these standards, the non-moving party must do more than show there is "some metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

Although inferences must be drawn in favor of the non-moving party, "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Similarly, the non-moving party cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex v. Catrett, 477 U.S. 317, 324,

15

(1986)).

The non-moving party has the burden of producing evidence to establish each element of his claim. <u>Celotex</u>, 477 U.S. at 322-23. The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. <u>Anderson</u>, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" ' <u>Matsushita Elec.</u>, 475 U.S. at 587 (citations omitted).

Furthermore, the United States Court of Appeals for the Third Circuit has consistently applied the burden shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) in cases that arise under the Rehabilitation Act. <u>Wishkin v. Potter</u>, 476 F.3d 180, 185 (3d Cir. 2007). Under the <u>McDonnell Douglas</u> burden shifting paradigm, Mr. McDonald has the initial burden to make a <u>prima facie</u> showing of discrimination. If he does, then the burden shifts to the OAG to articulate some legitimate, nondiscriminatory reason for the employment action. <u>McDonell</u>, 476 F. 3d. at 802. If the OAG meets this relatively light burden, Mr. McDonald must then be afforded an opportunity to show that the OAG's stated reason for the employment action, such as plaintiff's rejection or separation, was pretextual. <u>Id.</u> at 804.

In summary, the inquiry under a Rule 56 motion is whether

16

the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one-sided that the movant must prevail as a matter of law because no reasonable jury could return a verdict in her favor.  It is on this standard that the court has reviewed OAG's motion and Mr. McDonald's response thereto.

IV. <u>Discussion</u>

The OAG, in its summary judgment motion, advances five arguments: 1) Mr. McDonald's failure to accommodate claims are time barred by the applicable statute of limitations; 2) Mr. McDonald is not a qualified individual with a disability because he is unable to perform the essential functions of his job, with or without a reasonable accommodation; 3) the OAG made good faith efforts to engage in the interactive process; 4) the OAG had legitimate, non-discriminatory reasons for terminating his employment; and 5) there is no causal connection between Mr. McDonald's alleged protected activity and the decision to terminate him.  We shall address each of these arguments in turn.

1. <u>Statute of Limitations</u>

The OAG contends that Mr. McDonald's failure to accommodate claims under the Rehabilitation Act are time barred

because his complaint was not filed in this court within two years
of the alleged acts of discrimination.[6]  Claims brought pursuant to
Section 504 of the Rehabilitation Act are subject to a two-year
statute of limitations.  See Disabled in Action of Pa. v. Se. Pa.
Transp. Auth., 539 F.3d 199, 208 (3d Cir. 2008) (holding that "the
statute of limitations applicable to claims under . . . Section 504
of the RA is the statute of limitations for personal injury actions
in the state in which the trial court sits. In this case, the
applicable statute is 42 Pa. Cons. Stat. § 5524, which prescribes
a two-year statute of limitations").  Mr. McDonald acknowledges the
two-year statute of limitations, but argues that the OAG's denial
of his accommodations constitutes a "continuing violation," thereby
preserving his claims.

        A continuing violation "renders a complaint timely if any
act that is part of the continuing violation took place in the
statute of limitations." Estrada v. Trager, No. 01-4669, 2002 WL
31053819, at *3 (E.D. Pa. Sept. 10, 2002) (citing Nat'l R.R.
Passenger Corp. V. Morgan, 536 U.S. 101 (2002)).   Under this
theory, "'the plaintiff may pursue a ... claim for discriminatory
conduct that began prior to the filing period if he can demonstrate
that the act is part of an ongoing practice or pattern of
discrimination of the defendant.'" Campbell v. United States, No.

---

[6]

The parties do not dispute the timeliness of Mr. McDonald's claim
that the OAG fired him because of his disability.

18

09-1075, 2010 WL 1254699, at *2 (3d Cir. April 2, 2010) (quoting West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)).  The classic example of a continuing violation is a hostile work environment claim.  See Morgan, 536 U.S. at 115.

  The Supreme Court has held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  Id.   In Morgan, the Supreme Court held that because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice,'" Morgan could "only file a charge to cover discrete acts that 'occurred' within the appropriate time period."  Id.  In other words, "because Morgan first filed his charge with an appropriate state agency, only those acts that occurred 300 days before February 27, 1995, the day that Morgan filed his charge, are actionable."  Id. at 114.

  This principle "extends to a denial or refusal of an accommodation which is a discrete act."  Sessa v. Sears Roebuck & Co., Inc., No. 03-5477, 2004 WL 2203743, at *3 (E.D. Pa. 2004); see also Zankel v. Temple University, 245 Fed. App'x. 196, 198-99 (3d Cir. 2007) (holding that Zankel's complaint was untimely with respect to Temple's denials of requests for accommodation because Zankel's May 2001 termination was a "discrete act, not a continuation of any earlier failures to accommodate that may have occurred between September 1997 and January 2000.")).

Other courts have specifically held that an employer's rejection of an employee's proposed accommodation is the type of discrete act that must be the subject of a complaint to the EEOC within the statutory period. Sessa, 2004 WL 2203743, at *3 (citing Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134-35 (2d Cir. 2003); Cherosky v. Henderson, 330 F.3d 1243, 1247 (9th Cir. 2003)); see also DeLa Cruz v. Piccari Press, 521 F.Supp.2d 424, 433 (E.D. Pa. 2007) ("When an employee alleges 'serial violations,' i.e., a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation"); Tobin v. Liberty Mutual Insurance Co., 553 F.3d 121, 129 (1st Cir. 2009) (holding that an employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee.   If the request is refused, "the refusal is a discrete discriminatory act triggering the statutory limitations period").   Furthermore, the Supreme Court has held that "[m]ere requests to reconsider . . . cannot extend the limitations period applicable to civil rights laws."   Delaware State Coll. V. Ricks, 449 U.S. 250, 261 n. 15 (1980); Long v. Howard University, 512 F. Supp. 2d 1, 17 (D.D.C. 2007).

Normally, the timing of requests for accommodation is an issue of fact that the jury should be asked to decide.   Tobin, 553 F.3d at 133.   In Tobin, the First Circuit, on similar facts, affirmed the District Court's finding that Mr. Tobin had

20

effectively raised a dispute of material fact as to whether his requests for accommodation were made within the applicable statute of limitations period.  In that case, Mr. Tobin had testified that he had "continually made the same [] requests for accommodations" during his weekly meetings with his supervisors.  The District Court concluded that "[w]hile thin, this evidence, when coupled with evidence of meetings between [supervisors] and Tobin," was sufficient to raise a genuine dispute of material fact as to whether Mr. Tobin had requested accommodation during those meetings.  Id. at 134.

In this case, it is undisputed that Mr. McDonald filed his suit in this court on May 15, 2008.  As a result, only allegations of failure to accommodate that occurred two years earlier, starting on May 15, 2006, are timely.  Here, Mr. McDonald argues that the OAG rejected or failed to respond, inter alia, to his request for a different vehicle on several occasions, beginning in the summer of 2005.  The last evidence of such an accommodation request before his firing is the January 9, 2006 email to his supervisor William Raquet, which stated: "Just a friendly reminder concerning a past request, if a vehicle becomes available may I switch it for my current vehicle? If this is a problem I understand and you can disregard this request.  As always thank you for your

21

time and attention." [Doc. No. 25, Ex. 18].[7]   Mr. McDonald's
January 9[th] email is clearly a request to reconsider a past request
for a different vehicle, which may not revive a time-barred claim.
See Long v. Howard University, 512 F. Supp. 2d 1, 17 (D.D.C. 2007).
As a result, Mr. McDonald's claim that the OAG rejected his request
for a reasonable accommodation to assign him a new and/or modified
vehicle is time barred.

        As a result, we conclude that Mr. McDonald's failure to
accommodate claims are time barred, and will grant the OAG's motion
for summary judgment on that claim.[8]


2. Otherwise Qualified Individual

        The OAG next argues that Mr. McDonald is not an otherwise
qualified individual with a disability because he is 1) unable to
perform the essential functions of his job, and 2) precluded from
doing his job based on the medications he was taking.  Mr. McDonald
in turn argues that he was able to perform the essential functions
of his job with certain reasonable accommodations, and that his
medications did not affect his job performance.

_____

[7]

The parties dispute whether this was, in fact, a request for an
accommodation.  For purposes of this opinion, we assume that it
was.

[8]

Because a request for a reasonable accommodation triggers a duty
to engage in the interactive process, we conclude any claim that
the OAG has failed to engage in the interactive process is time
barred as well.

A. Essential duties of the job

The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applicable to federal employers and to employers receiving federal funding such as the Pennsylvania Attorney General's Office. See 29 U.S.C. § 791(g). The relevant statutory language provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a).

The Rehabilitation Act defines the term "individual with a disability" as "any person who ... (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). The Rehabilitation Act "forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." Shiring v. Runyon, 90 F.3d 827, 830-31 (3d Cir. 1996).

In order to make out a prima facie case of discrimination under the Rehabilitation Act, Mr. McDonald must establish: (1) that he is a "handicapped individual" under the Act, (2) that he is

23

"otherwise qualified" for the position sought, (3) that he was excluded from the position sought "solely by reason of his handicap," and (4) that the program or activity in question receives federal financial assistance. <u>Menkowitz v. Pottstown Memorial Medical Center</u>, 154 F.3d 113, 123 (3d Cir. 1998). The OAG does not dispute that: 1) Mr. McDonald was, at all relevant times, a person with a disability; 2) that Plaintiff was terminated because of his disability, or 3) that it is subject to the Rehabilitation Act. Rather, the OAG argues that Mr. McDonald was not "otherwise qualified" because he could not perform the essential functions of his special agent job.

A "qualified individual" is defined in pertinent part as one who, "with or without reasonable accommodation, can perform the essential functions of the job that the individual holds or desires." 42 U.S.C.A. § 12111(8); <u>Buskirk v. Apollo Metals</u>, 307 F.3d 160, 168 (3d Cir. 2002). "[T]he burden is on the employee to prove that he is 'an otherwise qualified' individual." <u>Runyon</u>, 90 F.3d at 832. In order to establish that a plaintiff is "qualified," "the employee must show that he/she 'satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires.'" <u>Conneen v. MBNA America Bank, N.A.</u>, 334 F.3d 318, 326 (3d Cir. 2003) (quoting <u>Skerski v. Time Warner Cable Co.</u>, 257 F.3d 273, 278 (3rd Cir. 2001)).

24

If a plaintiff makes that showing, he or she must then establish that "with or without reasonable accommodation, [he] can perform the essential functions of the position held or sought." Id. The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and not at the time of the lawsuit. Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998).

Here, the parties disagree as to whether Mr. McDonald can perform the essential duties of the job of special agent. Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1). The term "essential function" does not include the "marginal" functions of the position. Id. A job function may be considered essential for any of several reasons, including, but not limited to, the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

Id.

Evidence of whether a particular function is essential

25

might include, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3); see also 42 U.S.C. § 12111(8)(A reviewing court must consider the "employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job").

However, a job description is not conclusive evidence of the essential functions of a particular job.  Although an employer is free to craft requirements for the positions that it creates, it is not free to avoid the strictures of the ADA or the Rehabilitation Act by simply characterizing all "requirements" as "essential functions."  Johnson v. McGraw-Hill Companies, 451 F.

26

Supp. 2d 681, 704 (W.D. Pa. 2006). The Court of Appeals has noted that the employee's own experience in the position is relevant to the inquiry. Conneen, 334 F.3d at 326 (citing Sherski, 257 F.3d at 281). Ultimately, "whether a particular function is essential is a factual determination that must be made on a case by case basis." Sherski, 257 F.3d at 279 (citing EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, App. 1630.2(n) (2000)).

The OAG argues that Mr. McDonald was medically unable to perform the essential duties of his job. At the time of his firing on May 31, 2006, it is undisputed that Mr. McDonald had not been cleared to return to work by any physician, including his own. Furthermore, Mr. McDonald admitted in his deposition that he was unable to work at the time of his discharge:

> Q. Prior to receiving your [discharge] letter, did you make any attempt to return to work at the OAG?
>
> A. No.
>
> Q. And you didn't provide them with any documentation that you were able to return to work at that time, did you?
>
> A. No.
>
> Q. Were you able to return to work at that time?
>
> A. No.

[Doc. No. 25, Ex. 8, p. 73].

Mr. McDonald counters by arguing that he never conducted

27

the vast majority of the duties listed in the special agent job position, and that he could have performed his duties if the OAG had granted his accommodation requests. Mr. McDonald argues that he never, inter alia, conducted surveillance via electronic listening devices, assumed an undercover identity to infiltrate the criminal element, or developed and maintained contact with informants in hostile environments. Mr. McDonald testified that most of the arrests were pre-arranged, that few were ever hostile or confrontational and that he always had another agent with him. He further affided that he was able to participate in those arrests, including those that required him to "take down" suspects.

        After reviewing the record and taking all reasonable inferences in the light most favorable to Mr. McDonald, the court cannot definitively conclude that Mr. McDonald's position as a special agent in the insurance fraud division required him to perform all of the duties listed in the special agent's job description.    The job description title simply states "special agent," and refers to the many departments where a special agent might work. Mr. McDonald testified that he did not perform all of the functions listed in the description as an insurance fraud special agent.   His testimony is supported by the testimony of Robert Gift, a former colleague of Mr. McDonald. Gift testified that he did not perform every task listed in the OAG's job description: "The only thing I see on here that I might not have

done when I was with the insurance fraud section was develop and maintain contact with informants . . . that's not something you normally do in the Attorney General's - in the insurance fraud section." [Doc. No. 25, Ex. 10, p. 17]. Furthermore, the doctors's reports opining on Mr. McDonald's inability to perform the essential functions of his job were based on the general job description provided by the OAG.

Where there are positions within a particular job classification where an employee never has to perform certain alleged requirements, a genuine issue of material fact arises as to whether those requirements are in fact "essential." Acevedo v. City of Philadelphia, 680 F.Supp. 2d 716, 735 (E.D. Pa. 2010) (citing Cripe v. City of San Jose, 261 F.3d 877, 888-89 (9 th Cir. 2001); Dorris v. City of Kentwood, No. 094-249, 1994 WL 762219, at *3 (W.D.Mich. Oct. 4, 1994)). Therefore, a genuine issue of material fact exists as to the essential responsibilities of a special agent in the insurance fraud division, which precludes a grant of summary judgment in favor of the OAG on this issue.

## B. Prescription Drug Use

The OAG also argues that it does not permit its agents to work under the influence of narcotics. The parties agree that Mr. McDonald was using prescription narcotic medication. However, the OAG has produced no evidence as to whether and under what

29

circumstances prescription drug use is a disqualifying condition for its special agents. Furthermore, Dr. Hall admitted in his deposition that he made his assessment that Mr. McDonald could not function based on how medication affects people generally, not Mr. McDonald in particular: "[D]ifferent medications affect different people differently. So do I specifically know how it affects him? No." Mr. McDonald also affides that he was able to pass his weapons certification test in twice in 2005, before Dr. Hall's evaluation. [Doc. No. 35, Ex. 2, p. 2]. As a result, there is a genuine issue of fact as to whether Mr. McDonald was medically unqualified for his job based on his prescription drug use.

In conclusion, the court finds that there is a genuine issue of material fact as to whether Mr. McDonald is an "otherwise qualified individual" under the Rehabilitation Act. This genuine issue of material fact "thus precludes this Court from proceeding to the question of whether Plaintiff could perform those functions with or without a reasonable accommodation. In turn, without resolution of these inquiries, Defendant cannot prove Plaintiff's inability to succeed on his discrimination claims." Acevedo, 2010 WL 271350, at *17.

Therefore, the court will deny the OAG's motion as to whether Mr. McDonald is an otherwise qualified individual under the Act. This also necessitates the court denying the OAG's motion as to whether Mr. McDonald can prove that its reasons for firing him

are pretextual.

3.  Retaliatory firing claim

        The OAG's final argument is that there is no casual
connection between Mr. McDonald's firing and his requests for
reasonable accommodation.  To survive summary judgment on a claim
of retaliation under the Rehabilitation Act, a plaintiff must
satisfy his burdens under the McDonnell Douglas framework.
Luckiewicz v. Potter, 670 F. Supp. 2d 400, 411 (E.D. Pa. 2009).  To
establish a prima facie case of retaliation under the
[Rehabilitation Act], a plaintiff must show: "(1) protected
employee activity; (2) adverse action by the employer either after
or contemporaneous with the employee's protected activity; and (3)
a causal connection between the employee's protected activity and
the employer's adverse action."  Id.  Here, the parties only argue
whether there was a sufficient casual connection between the
protected activity and the adverse action.

        In order to establish a causal connection, a plaintiff
must demonstrate either (1) a temporal proximity between the two
events that is "unusually suggestive" of retaliation, see Williams
v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir.
2004), or (2) timing plus other evidence, such as evidence that the
employer engaged in a "pattern of antagonism" with the plaintiff,
see Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir.

                              31

1993) (A "pattern of antagonism" existed because the employer engaged in a "constant barrage of written and verbal warnings ..., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge.").

The OAG argues that the nine-month gap between Mr. McDonald's request for a new vehicle in August of 2005 and his medical discharge at the end of May 2006 "belies any claim that the OAG's decision was motivated by retaliation for a purported accommodation request." Mr. McDonald's only argument is that the last time he engaged in protected activity was in January 2006, nearly five months before his firing, when he sent an email to Mr. Raquet requesting a new vehicle.

Timing alone is "normally insufficient to raise an inference of causation." Luckiewicz, 670 F. Supp. 2d at 411 (citing Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001) (holding that timing is rarely sufficient to raise an inference of causation). The Third Circuit has recognized that causation may be established by timing alone where the adverse employment action follows within days of the complaint of discrimination. See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (holding that timing of termination two days after employer learned of EEO complaint raised inference of causation).

However, in Williams, the Third Circuit found that a

32

period of two months was not "unusually suggestive" of retaliation. 380 F.3d at 760. Other courts have also found that time periods as short as two months, without additional evidence, are not "unnecessarily suggestive" to demonstrate causation. See Luckiewicz, 670 F.Supp.2d at 412 (one month); Washco v. Fed. Express Corp., 402 F.Supp.2d 547, 560 (E.D. Pa. 2005) (five months); Zappan v. Pa. Bd. of Probation & Parole, No. 00-1409, 2002 WL 32174230, at *10 (E.D. Pa. Nov. 25, 2002) (two months); Pritchett v. Imperial Metal & Chem. Co., No. 96-0342, 1997 WL 570929, at *4 (E.D.Pa. Sept. 8, 1997) (two months).

As a result, the court finds that the nearly five months that passed between Mr. McDonald's last alleged request for accommodation and his firing are not sufficient, on their own, to establish causation. Mr. McDonald presents no evidence that he was subject to a "pattern of antagonism" that began with his first accommodation requests. The court will therefore grant the OAG's motion for summary judgment as to Mr. McDonald's retaliatory firing claim.

V. Conclusion

In conclusion, the court will grant the OAG's motion for summary judgment as to Mr. McDonald's failure to accommodate and retaliatory firing claim claims. The court will deny the OAG's motion as whether Mr. McDonald is a qualified individual under the

Rehabilitation Act.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Richard McDonald,                    )
                                     )
            Plaintiff,               )
                                     )
     v.                              )   Civil Action No. 08-0658
                                     )
Pennsylvania Office of               )
Attorney General                     )
                                     )
            Defendants.              )

ORDER

AND NOW, on this 10th of May, 2010, IT IS HEREBY ORDERED

that defendant's motion for summary judgment [Doc. No. 25] is

GRANTED in part and DENIED in part. The court rejects plaintiff's

continuing violation theory argument. The motion is therefore

GRANTED as to plaintiff's failure to accommodate/failure to engage

in the interactive process claims. Defendant's motion for summary

judgment as to plaintiff's retaliatory firing claim is also

GRANTED.

The motion is DENIED and the case will go to trial as to

whether plaintiff is a qualified individual under the

Rehabilitation Act and whether defendant discharged plaintiff in

violation of the Rehabilitation Act.

BY THE COURT:

_____ C.J.

cc: All counsel of record